## MURPHY'S ADMINISTRATORS v. CRAIN.

To establish a breach of warranty of soundness, in case of the death of a negro. from disease, it must be proved that the negro was unsound at the time of the sale, and that the unsoundness then existing was the occasion of his death. (That is, we presume, where the full value is claimed, and not where a claim is made for the difference between the sound and unsound values.—REP.)

The rule as to soundness is, that if, at the time of the sale, the animal has any disease which either does diminish the natural usefulness of the animal, so as to make it less capable of work of any description, or which in its ordinary progress will diminish the natural usefulness of the animal; or if the animal has, either from disease or accident, undergone any alteration of structure, that either actually does at the time, or in its ordinary effects will diminish the natural usefulness of the animal, such animal is unsound.

A natural weakness or deficiency in physical proportions and power, and a constitutional susceptibility to disease, are not, it seems, covered by a warranty of soundness; at least where they are equally open to the observation of both buyer and seller.

On a breach of warranty of soundness, the measure of damages where there is a total loss of the property, is different from where there is only a partial loss; but damages should be awarded in a sum commensurate, as nearly as may be, with the injury sustained, except in those cases in which exemplary damages are permitted to be given.

Judgment reversed in this case on the ground that the verdict was contrary to law and the evidence, and that the Court below erred in refusing to grant a new trial.

Appeal from Harrison. Action by appellee against appellants on a covenant of warranty by their intestate, of two slaves, Catherine and her child. There were no questions on the pleadings. Verdict, July 27th, 1853, for plaintiff for $800 principal, and $208 interest. Remittitur of $10 interest. Motion for new trial on the ground that the verdict was contrary to law and the evidence; overruled. The evidence was as follows: Bill of sale from Murphy to Crain, dated February 18th, 1850, of " a negro girl of dark com- " plexion, aged about seventeen years, named Catherine, and " her child named Elizabeth, aged about eight months, for the " sum of eight hundred dollars, warranted sound in body and. " mind·and slaves for life."

Dr. B. F. Young called for plaintiff: Was called to see the girl by Thomas Murphy, February, 1850; laboring under a severe attack of pleurisy in the left side; was pregnant, appeared to be fourteen or fifteen years of age; in his opinion premature conception had stopped and prevented the development of her constitution, and in consequence her chest was small and contracted and she was liable to disease of the chest; recovered from the attack of pleurisy, and as to it she was, on recovery, well, but having had the attack she would be more liable to another attack, and that as a general rule, the pleurisy leaves permanent consequences of the disease in the system, and after an attack the person is predisposed to a return of the same disease; in consequence of the premature pregnancy she was unable to endure the usual hardship and labor incident to slave labor; after her recovery from her confinement he prescribed two or three times for her on account of a light attack of chills; she recovered from said attack of pleurisy and was well and sound of said disease, pleurisy; he was called in afterwards to attend said girl in childbed, (August, 1850,) found her doing as well as persons usually do under such circumstances, delivered her and saw no symptoms of disease in her chest; was called in by plaintiff, latter part March, 1851, to see the same girl; found her laboring under a violent attack of pleurisy; she partially recovered, relapsed and died, May, 1851; child died after the mother, was delicate but not diseased previous to the mother's death; in his opinion the child inherited the weakness and infirmities of its mother.

Dr. Eames, called, testified that a person as described by Dr. Young would be, as a general rule, predisposed to disease; that pleurisy, as a general rule, leaves permanent effects in the system.

Whitford, called, testified that a few days after the purchase by Crain of said negroes, he met Murphy in the town of Marshall, and they were conversing about Murphy's improving the place he got of Crain, and getting him to do it, when

he said to Murphy, you have given too much for the house
and lot, and Murphy said to him, it made no difference as the
negro girl he had let Crain have in part payment of the pro-
perty was of no use to him.  Plaintiff rested.

Defendant called G. O. Dunaway, who testified that he sup-
posed Crain was getting tan bark about four miles from Mar-
shall, on a creek or branch ; that he had the negro girl with
other negroes there ; that witness saw her and child coming
home (to Marshall) from said place on 27th March, 1851 ;
that it had snowed the night before and that the negro girl
was walking in the snow ; that he supposed the negroes had
been getting tan bark there, because he went there afterwards
to get the bark which he had bought from Crain.

Hodges, called, testified, was getting bark for plaintiff lat-
ter part of March, 1851 ; plaintiff went down with them ; said
negro girl rode Mr. Crain's horse part of the way to where they
were getting bark ; place where they encamped was about
four miles from Marshall, upon a branch, on a kind of second
bottom ; covered their camp with bark ; rain came on, bark roof
leaked ; then covered their camp with boards, and dug a ditch
on both sides of the camp to keep the water off; remained
there five or six days ; on night 26th March, heavy snow
came on, and they left next morning for the plaintiff's at Mar-
shall ; the negro girl with the other hands walked ; she had
her child ; she complained and was sick one night before they
left the camp, after the rain.

Henby, called, testified, he had managed Murphy's negroes
in Tennessee for some three years, and up to time Murphy
brought his negroes to Texas in 1850, he knew said girl ; that
she appeared sound and healthy ; that he saw her once at
Murphy's after she had been brought to Texas and before she
had been sold, and she was then grubbing ; that she was
about seventeen years old when she was sold by Murphy to
Crain.

Plaintiff proved, upon cross-examination, by Dunaway, that
when they went (the negroes) to get the bark, the leaves were

put out, and it was warm weather; also, upon cross-examination, by Hodges, that the negro girl cooked for them while they were getting bark; that she had plenty of cover and clothing, and that where the shelter was, it was dry after they boarded it.

Defendant proved upon cross-examination of W.hitford, that he was at Crain's in the month of May and in all the Summer months of 1851, and that every time he was there he saw the negro girl and child bought by Crain from Murphy.

Plaintiff further proved by Dr. B. F. Young, that he told Murphy his negro had recovered and was out of danger, in the first attack, and that Murphy then said he considered himself six hundred dollars better off.

Defendant excepted to the questions propounded to B. F. Young, as to his opinions about the incapacity of the negro girl to perform work and endure the hardships of negro labor, and as to his opinion as to the effects of the premature conception and the effects consequent upon her attack of pleurisy first spoken of, which exceptions were overruled by the Court. Defendant also excepted to the question proposed to Dr. Eames, and his answer thereto, which exception was overruled.

The statement of facts was not agreed upon by the parties, and was certified by the Judge accordingly.

The Judge charged the jury as follows:

If the jury believe from the evidence that the negro was diseased or unsound at the date of the sale, of which disease or unsoundness she died, or was the immediate cause of her death, then the plaintiff is entitled to recover; and the rule of damages is the purchase money paid and eight per cent. thereon from the date of the death of the negro.

On the other hand should the proof convince you that the negro at the date of the sale, was sound and free from disease, as above laid down, you will in such case find for the defendant.

Again, should you find that the negro was unsound at the

time of the sale and that such unsoundness was not the immediate cause of her death, but her death was caused by disease independent and unconnected from the defect at the time of the sale, then plaintiff is only entitled to recover the difference between the value of the negro at the date of sale and the price paid, and in the absence of such proof, the plaintiff cannot recover on this branch of the charge.

The defendants asked the Judge to instruct the jury as follows:

1st. That the measure of damages in this case, is the difference between the value which the negroes sold to plaintiff would have had at the time of sale, if they had been sound or corresponding to the warranty, and their actual value with their defects, if any they had.

2nd. That if it has not been proven what the value of the negroes would have been, at the time of the sale, if they had been sound, as warranted, and if it has not also been proven what their actual value was at the time of the sale, considering them to have been unsound, they cannot find for the plaintiff.

These instructions were refused.

*C. M. Adams*, for appellants. I. The Court erred in overruling appellants' motion for a new trial. It is confidently submitted, that, so far as the evidence shows, the negroes were sound at the time of the sale ; that is, they were clear of disease. Dr. Young stated, that, at that time, the negro woman was well and sound of the pleurisy ; and Henby, who managed the intestate's negroes for three years in Tennessee, previous to his removal to Texas, in 1850, stated, that she appeared sound and healthy ; and it might be here noticed, that the appellee kept the negroes for more than a year ; that he never offered to return them ; and that he never even complained of their unsoundness, previous to their death. Hence, we think, it clearly appears, affirmatively, that the negroes were sound.

But it is stated, that, having had pleurisy once, the negro woman was more liable to a return of the same disease; and that, as a general rule, pleurisy leaves permanent effects in the system. This may be true; but if it is, it does not come within the purview of a general warranty of soundness. By the term, "permanent effects," as here used, I understand that her constitution was, in some degree, impaired; and that she was in consequence of it, more liable to disease. Every disease leaves its permanent impress upon the constitution; and the question here is, not whether she was liable or predisposed to disease, but whether she was actually diseased, or had the seeds of disease in her system, at the time of the sale; the latter is an unsoundness, but the former is not; for the one is progressive in its character, and the other is not. (See Chitty on Con. 464; Brown v. Elkington, 8 M. & Wels.) This case is very much in point; see also 2 B. M. 452.

As to the premature conception of the negro girl, and, as a consequence thereof, her bad developments, and inability to do the hardships incident to slave labor, I think Dr. Young was mistaken; for she is stated in the bill of sale to have been seventeen years of age; and Henby, who knew her well, stated that she was at that age, at the time of the sale, and a conception at that age, or between sixteen and seventeen, cannot be said to be premature. But be this as it may, these defects could have been seen by any one as well as by a physician, and were not covered by the warranty. (Brown v. Elkington; Story on Sales, Sec. 354.)

It is not strange that the negro woman took sick and died in the spring, 1851, under the circumstances proved.

The testimony is positive, that the child was sound previous to its mother's death; and as to it, there was no breach of warranty, unless to inherit defects be a breach, which only rendered the mother more liable to disease. But the child could not have inherited these defects. (Dean v. Traylor, 8 Ga. R. 169.)

II. The second assignment of error is, "That the Court

" erred in overruling appellants' exception to testimony, offer-
" ed by the appellee."

Dr. Young stated, '' that, in his opinion, the child inherited
the weakness and infirmities of its mother." There is a
difference between testimony, that a child did inherit, and that
children generally inherit, &c., which should be recognized in
this sort of questions. The fact, in this case, went to the jury
as evidence, and not the opinion. He might have stated his
opinion, whether the child was likely to inherit, &c., on the
same principle that medical men are allowed to state their
opinion whether certain wounds were likely to be the cause of
death. (1 Phil. Ev. 290.)

III. The third assignment of error is, that " The Court
erred in charging the jury as to the measure of damages;"
and the fourth, that " The Court erred in refusing to charge
the jury as requested by appellants' counsel."

The first charge, asked by appellants, being refused, the ap-
pellee got the services of the negro woman for about thirteen
months, and the child, born after the sale, for nothing. (See
2 Greenl. Ev. Sec. 262; and Sedgwick on Slaves, 290.)

We cannot be answered by the appellee, as to the second
charge, that there are no corresponding averments in his peti-
tion; and that the Court did right, therefore, in rejecting it;
for the petition seeks to recover the purchase money, with in-
terest, which can only be done by averring and proving that
he had returned, or offered to return, the negroes; or, that
they were utterly worthless. This was not done. The state-
ment of facts shows that the negro woman was valuable to
the appellee; and it would be repugnant to the sense of jus-
tice to allow the verdict to stand. (Ramsay v. McCawley, 2
Tex. R. 189; Borden et al. v. Houston, Id. 614, 615.)

C. A. Frazer, for appellee. It is true that Drs. Young and
Eames were permitted to give their opinions as testimony to
the jury, but those opinions were based upon facts which were
before the jury, and they were given as to the natural effects

or consequences of those facts, which were determinable by men skilled in the science of medicine, as these witnesses must be presumed to be. The principles of law governing such testimony are too familiar to require a reference to authorities to show its competency. (But see 1 Greenl on Evidence, Sec. 440.)

It was proven as a fact, that Catharine had a small contracted chest, and it was to show the causes and consequences of this that these physicians were called upon to explain that fact. Dr. Young gave it as his opinion that she had been prematurely pregnant, and that it had stopped and prevented the development of her chest, and that in consequence of it she was not able to endure the usual hardships and fatigue incident to slave labor, and that on account of it she was predisposed to diseases of the chest; and Dr. Eames gave it as his opinion, that such a person as she was described to be, would be liable to pleurisy. These witnesses testify that, in their opinion, the effects mentioned proceeded as natural consequences from her conformation, and that Dr. Young states that this conformation was not natural, but that it resulted from premature pregnancy. Consequences, or effects of a given state of things, are necessarily arrived at by deduction, for they are not self existing, independent facts; and if they are matters of science or professional skill, the masters of that science or profession may be called in, to deduce those consequences or effects from the given state of facts, and the deduction is their opinion; and it, when expressed, is to be received as entitled to as much confidence as the testimony of the witness who swears to the facts from which the deduction is drawn.

It is said in the books, in some instances, that to constitute unsoundness there must exist in the system the seeds of disease, and not merely a predisposition to it. This precludes the idea of a mere natural weakness, which renders the person more liable to disease than one who is robust, being unsoundness; but when the constitution has been enervated or impaired by

artificial causes, to such an extent that the effect is to give an unnatural liability and tendency to disease, that unnatural liability and that unnatural tendency are the seeds of disease. They were transplanted by artificial causes, and their legitimate growth, without undergoing any change, is to ripen into disease—to continue their enervating influence upon the constitution and health until they undermine both, and complete the work of death upon the sufferer. Such was the case in this instance; for Dr. Young testifies that the malformation of Catharine's chest was not natural, but that it resulted from the accidental—the artificial cause, which he mentioned—that it was the result of premature pregnancy, and that it had affected her to such an extent that it rendered her liable to diseases of the chest, and unable to undergo the hardships and fatigue of slave labor. Dr. Eames stated that a person of her conformation was liable to pleurisy. The testimony of both of them is corroborated by the other proof in the cause. It is in evidence that she had a severe attack of pleurisy just before the sale; that just after the sale, Murphy stated that she was worth nothing to him—this must have been on account of her disability to serve him,—and that she ultimately died of pleurisy. The extent of the unsoundness at the date of the sale has nothing to do with the question.

Kiddell v. Burnard, 9 Mees. & Wels., p. 668. In this authority, the rule as to unsoundness is thus stated: "I have " always considered that a man who buys a horse warranted " sound, must be taken as buying him for immediate use, and " has a right to expect one capable of that use, and of being " immediately put to any fair work the owner chooses. The " rule as to unsoundness is, that if, at the time of the sale, the " horse has any disease, which either actually does diminish " the natural usefulness of the animal, so as to make him less " capable of work of any description, or which in its ordinary " progress will diminish the natural usefulness of the animal; " or if the horse has, either from disease or accident, under- " gone any alteration of structure, that either actually does at
20

" the time, or in its ordinary effects will diminish the natural " usefulness of the horse, such horse is unsound."

The application of this authority is so plainly to be seen, that no comment on it would be necessary before any tribunal, and especially before this. The testimony is that the negro had undergone from an accidental cause, such a change of structure as to diminish her usefulness and render liable to disease, and that she was not capable of being put to, and undergoing, any fair work her owner might choose—the ordinary work of slaves.

It may suggest itself, that the appellee when he made the purchase must have seen that the chest of the negro was small and contracted ; but he could not have seen that it resulted from an accidental cause, which stopped and prevented the development of her chest—that it rendered her unable to undergo the fatigues of slave labor—that it rendered her liable to disease—that it was itself a disease which had impaired the vital functions of the chest to an extent sufficient to diminish her usefulness—that it had rendered her worthless to Murphy, as he stated to one of the witnesses she was.

It is now submitted that that portion of the testimony of Drs. Young & Eames which was objected to was competent, and that it tended to prove the cause of action as alleged in the petition, and that therefore the objection to it was properly overruled.

It is clearly in proof, that the child Elizabeth inherited the weakness and infirmities of its mother, which amounting to unsoundness in the mother, must have been unsoundness in the child. That which is unsoundness in one person, will be in another. The disease of the mother was entailed upon the offspring, and they both died of the same primary cause, though in them it may have manifested itself differently. Thus is the assignment, that the Court erred in overruling the objection to the testimony of Drs. Young & Eames, disposed of, and also that the verdict of the jury is contrary to the evidence, with a quotation from the opinion of this Court in the

case of Carter v. Carter, 5 Tex. R. 93, showing the law of the Court on this subject. The principles of that case go a much greater length to support the verdict against such an exception, than is required to sustain the verdict in this.

The Court held this doctrine: " There was evidence con-" ducing, at least in some degree, to this conclusion; and, " from a view of all the evidence in the record, it is not, per-" haps, less probable than the other conclusion. But to judge " of the degrees of probability and the weight of evidence, " belonged to the jury. These were subjects within their pe-" culiar and exclusive province. And when they have con-" fined themselves within their appropriate sphere, and have " acted upon a subject within their peculiar province, the " Court will not set aside their verdict and grant a new trial, " merely because they might, upon an examination of the " evidence, have arrived at a result different from that attain-" ed by the jury, or because the verdict is contrary to the mere " preponderance of testimony or weight of evidence; nor " merely because it may appear to them to be founded upon " slight evidence. (12 N. Hamp. R. 171; 2 A. K. Marsh. " R. 520; 2 Rep. Const. Ct. p. 431; 3 How. Miss. R. 219; 1 " Sumner, R. 451; 4 Dev. R. 450; 1 Meigs, R. 459.)

" It cannot with justice be objected, that there was entire " absence of proof in this case. The most we can say is, that " it was of doubtful import. And where the proof is of doubt-" ful interpretation, it is said, if the verdict can be sustained " in either aspect of the proof, it should not be disturbed. (6 " Da. R. 395.) And a verdict will not be disturbed, merely " because it rests upon inferences drawn from circumstances " not conclusively established. (4 B. Mon. R. 386.)

" Again, it has been held that an appellate Court will not " disturb the verdict, when there was any evidence in sup-" port of it." (2 Mon. R. 76, 142; 1 Meigs, R. 84.)

This decision is adopted not only as the law of this case, but also as a commentary upon the testimony, remarking that the principles announced pre-suppose a much weaker state of facts than those upon which this verdict is founded.

The appellee is willing and now offers to remit, should the Court deem the verdict excessive, an amount sufficient to meet the views of this Court as to the justice of the case. But it is insisted that the verdict is right.

*Clough & Lane*, also, for appellee.

WHEELER, J. There can be no difficulty as to what must be the disposition of this case. It cannot be successfully contended that there was any evidence which proved, or in any degree conduced to prove that the negro was diseased or unsound in the proper and legal sense of the term, at the time of the sale and warranty; much less that she was laboring under the disease, and in its incipient state, of which she died.

In the case of McKinney v. Fort, the doctrine was recognized, that, to establish a breach of warranty of soundness, in case of the death of a negro from disease, it must be proved that the negro was unsound at the time of the sale, and that the unsoundness then existing was the occasion of his death. (10 Tex. R. 220.)

There not only was no evidence of any unsoundness at the time of the sale; but, on the contrary, the only evidence directly to that point proved the contrary; that, though the negro had had an attack of pleurisy previously, she had recovered from the attack, and was sound and well of that disease. Even if the effects of the disease remained in her system, of which there was no evidence, and could be but a mere inference, from the opinion of the witness to the effect that, having had one attack she would be more liable to have another; and that, " as a general rule the pleurisy leaves permanent consequences of the disease in the system," it can scarcely be seriously contended that the evidence warranted the conclusion that that was the occasion of her death; or that the sickness of which she died was superinduced, or even remotely occasioned by her former attack, of which the witness testified; or, indeed, that she died of any disease or unsound-

ness existing at the time of the sale. After so great a lapse of time, and under the circumstances immediately attending her last sickness, the supposition that her death was the effect of the natural progress, or even that it was the remote consequence of any disease or unsoundness existing at the time of the sale, is quite too improbable to be seriously entertained. There might have been more reason perhaps for such a supposition, if her last sickness were not traceable directly to an immediate, natural and adequate cause; that is, her exposure to the inclemency of the weather, for five or six days, during which there was rain and snow, attended with a change from warm to extremely cold weather, with no shelter or protection from its extreme inclemency but a frail leaky camp; and though taken sick at the camp, having to walk and carry her infant through the snow, several miles to her master's residence. This was followed by a severe attack of pleurisy; of which, after a partial recovery and relapse, she died. And there could have been, it would seem, no doubt, and should have been no hesitancy on the part of the jury in coming to the conclusion, without the aid of professional opinions, as the only natural and probable inference to be drawn from the facts, that the disease of which she died was thus contracted. The facts were as open to the observation and understanding of non-professional as professional men. Or at least they were sufficiently so to warrant them in acting upon them from their own knowlege of antecedence and sequence, or cause and effect. It did not require professional knowledge in such a case, to perceive the relation of the sickness to the exposure; or to refer the one directly and certainly to the other as its cause. For all men are supposed to have a sufficient acquaintance with the obvious effects of known natural causes, upon subjects on which they are accustomed constantly to act in the common affairs of life, to form rational and sound conclusions, without the aid of professional knowledge: however necessary such knowledge may be to the formation of just conclusions on subjects, not thus obviously within the experience,

comprehension and knowledge of all men, but requiring for their proper understanding, professional knowledge and skill.

It is difficult to conceive how, in view of the facts of this case, any mind could resist the conviction that the sickness which resulted in the death of the negro was occasioned by the exposure to which she was subjected by the acts of the plaintiff; and for which the defendant was in no way responsible.

But it is said that, as it was proved that the negro had "a small, contracted chest;" and as, in the opinion of a professional witness, (a physician) this was occasioned by premature pregnancy, and rendered her less able to endure the fatigue incident to slave labor, and more liable to diseases of the chest than she otherwise would have been, she was consequently unsound within the legal definition of that term, as given by Parke, B. in the case of Kiddell v. Burnard (9 Mees. & Welsb. R. 668.) The learned Judge there said, "The rule "as to soundness is, that if, at the time of the sale, the horse "has any disease which either does diminish the natural use-"fulness of the animal, so as to make him less capable of work "of any description, or which in its ordinary progress will "diminish the natural usefulness of the animal; or if the "horse has, either from disease or accident undergone any al-"teration of structure, that either actually does at the time, "or in its ordinary effects will diminish the natural usefulness "of the horse, such horse is unsound. If the cough actually "existed at the time of the sale, as a disease, so as actually to "diminish the natural usefulness of the horse at that time, "and to make him then less capable of immediate work, he "was then unsound; or if you think the cough, which in fact "did afterwards diminish the usefulness of the horse, existed "at the time of the sale, you will find for the plaintiff." (Id. 669–70.)

This certainly is a comprehensive and clear exposition of the rule. And it will require but little attention to its import to determine with what justice it can be claimed to support

the plaintiff's case. By the very terms of the definition, and in the application of the rule to the case then before the Court, to constitute unsoundness within the meaning of the rule, the particular disease which either does or in its natural progress will diminish the natural usefulness of the animal, must have existed "as a disease" at the time of the sale. And this is in accordance with the rule as recognized in the case of McKinney v. Fort. But this cannot be claimed as a conclusion fairly deducible from the evidence in the present case. Again, it must be a disease which diminishes the natural usefulness of the animal; not merely a natural weakness or deficiency in physical proportion and power; or a constitutional susceptibility to disease, which cannot be said to diminish the natural usefulness of the animal. The meaning of the rule is not that a warranty of soundness, is a warranty that the animal possesses a given amount of capacity for service and endurance. It is that the animal has no disease which diminishes, or in its ordinary progress will diminish the capability for service which the natural form and proportions of the particular animal enable it to possess in the absence of disease; not that a form naturally delicate and feeble shall posses the strength, hardihood and powers of endurance of a robust, gigantic form.

But it is earnestly insisted that there was in the case of this negro an unnatural want of development of the chest, arising it is said, from an "accidental" cause, described by the physician whose testimony is relied on to establish the fact of unsoundness. If another witness (Henby) who seems to have possessed superior means of information and a more accurate knowledge of the fact to which he deposed, the age of the negro, is to be believed—and it is corroborated by the statement of the age of the negro in the bill of sale, where it was not likely to be exaggerated,—the physician was entirely mistaken as to the fact; and consequently in all his inferences and deductions on that subject, which were based on the assumed fact of the immaturity of age of the negro. And there

can be little doubt that he was mistaken, as the witness who testified to the fact, appears to have had superior means of information and to have testified from a knowledge of the fact; and not as to a mere matter of opinion, formed from the deceptive indications afforded by her appearance simply, as the physician, it seems, did. It can scarcely be seriously contended that opinions and deductions thus formed should serve as a basis of judicial action on such a subject.

But if the physician was not mistaken in his opinions, it is difficult to conceive how it can be earnestly insisted that the negro had, in the language of the rule as stated by the learned Judge whose opinion has been quoted and is relied on by counsel, " either from disease or accident undergone any alteration of structure," that either did or in its ordinary effects would diminish her natural usefulness, or as contended by counsel, give an unnatural liability and tendency to disease. The opinion of the witness did not tend in any degree to the supposition that there was any alteration of the structure of the chest from any cause ; but simply that there was not a full development of physical proportions in that particular. The want of development from such a cause, even if the supposition were probable, would seem a very different thing from having undergone an alteration of structure " either from disease or accident." Surely it cannot be supposed that by disease or accident the learned Judge meant to include natural causes, such as that to which the witness ascribed the want of proper physical development in this case. Even a natural deformity, if such a thing may be supposed, could not be described by any appropriate use of the words disease or accident ; and if equally open to the observation of both buyer and seller would not be included by a general warranty of soundness. Nor would any mere liability or tendency to disease, however unnatural, be a breach of such a warranty. It is unnecessary further to trace the supposed analogy between the case put by the learned Judge whose opinion seems to be so confidently relied on in the present case ; or rather to notice further the total want of analogy in the cases.

The present is not the case of an article bought for a particular purpose and warranted fit for that purpose, for which it turns out to be unfit. It is the ordinary case of a general warranty of the soundness of a negro. The utmost that can be claimed to have been established by the evidence on behalf of the plaintiff is that the negro had not a well developed chest, and that in this respect she was naturally weak, and more than ordinarily susceptible to diseases of the chest and pleurisy, and was less able to endure fatigue and hardship than an ordinarily stout and robust negro. But there was nothing in this which can be held to amount to a breach of the warranty. Her feebleness and incapacity to endure ordinary labor was as open to the observation of the plaintiff as to his vendor; and it should have served as a caution to deter him from subjecting her to extraordinary exposure and service which must have required, in her condition, quite extraordinary powers of endurance. In that exposure and service an adequate cause should have been found for her sickness and death, without recourse to her former owner, or seeking for a remote possible cause in her supposed liability to disease. The mere predisposition to disease is not disease in a legal sense, or in a sense which will amount to a breach of warranty of unsoundness. To hold the contrary, and especially to maintain the right of the plaintiff to recover the value of the property for a breach of warranty upon evidence of the character disclosed by the record in this case, would be a novel and dangerous precedent. If the evidence here relied on were to be held sufficient to establish the defendant's liability upon his warranty, it would be difficult to define or fix any limit to the meaning of unsoundness. It would be extremely dangerous to dispose by warranty of this, or any other, animate property. The vendor would indeed make the disposition at his imminent peril.

It is unnecessary to revise the ruling of the Court upon the question of the measure of damages. The action seems so devoid of merits on the facts, that it is not probable that

question will again claim the attention of the Court in this case.  And if it should arise upon another trial, it will suffice here to say, that the case of a total loss of property is to be distinguished, as, in the instructions asked by the defendant and refused, it does not seem to have been from a partial loss. But in so far as the instructions asked were intended to enunciate the general proposition that damages should be awarded in a sum commensurate as nearly as may be, with the injury sustained, that proposition, except in reference to those cases in which exemplary damages may be given, is as a general rule correct.

We are of opinion that the verdict was contrary to law and the evidence; and consequently that the Court erred in refusing a new trial.  The judgment is therefore reversed and the cause remanded for further proceedings.

Reversed and remanded.